Brown Distributors v. Brown  06-16-18 Collingbury Distributors v. Brown Mr. Stout, are you ready? Thank you, Your Honor. May it please the Court. I would like to reserve four minutes of my time for rebuttal, please. The patent suit in this case concerns true tolls for pets. Why is the claim construction issue here? That doesn't affect the judgment, does it? Not directly, Your Honor, no. Then how can we appeal? Well, the parties felt that it would help to resolve issues in this case, so when the parties submitted their proposal for a Rule 54B certification in this case, they included it as an issue. But if Rule 54B doesn't align with certified issues, it only allows for certified judgments. The only judgment here is the judgment of invalidity, and the claim construction doesn't affect that, does it? That is correct. I mean, the construction of meat product was not an issue under the summary judgment of obviousness. That is correct. So if the Court would like me to address the claim construction further in addition to the briefing at this point, I can do that, or move directly to the obviousness issue. I think you're directly obvious. This time is always very short, I'm not arguing. Thank you, Your Honor. The Court held Claims 1, 2, 4, 7, and 10 of the patent in suit obvious. We believe that the Court made erroneous findings with regard to the scope and content of the prior art, the differences between the prior art and the clinical invention, and the condition of the martial law to help me. I believe that based on the record and in your last week's decision in Case R v. Teleflex, a key issue in this case is whether the superior palatability of pork skin for use in pet chew toys was a predictable result based on the prior art, or whether it was not. Now, when we look at the record in this case, I think we have to conclude that it was not a predictable result, and in fact, ADI and Weinberg admit that in their opposition papers. None of the references anywhere even address palatability of pork skin. They do not provide any teaching or suggestion that pork skin has better palatability. Now, the palatability of a chew toy is a key criterion, because I can give a chew toy to a pet, but I cannot make it chew. So the product has to induce animal behavior. As such, it is a challenge to design a product that can induce the desired animal behavior and engage the pet for a long time. Now, the Brown patent teaches that the use of pork skin has this key advantage over rawhide, and it allows, therefore, to make a product that is superior to known pet chew toys, and therefore in advance over the prior art. And based on the prior art, based on the teaching, there was nothing that would have predicted that result. ADI and Weinberg admitted in their opposition that the prior art does not teach it, and the prior art even teaches away from it. There are two references that were considered, Lynch and Chong, and according to ADI and Weinberg, those two references would indeed suggest that pork skin does have poor palatability. While I do not address the point, both of these references discuss the use of coatings in order to make the product. Including pork hide. Is that different? Pork hide, pork skin, I think is the same thing for our discussion here. Now, those two references are interested in methods for removing fat from pork hide or pork skin. And that this pork skin can be used for treats for pets or things of that nature. However, both, according to ADI and Weinberg, also recommend that a coating should be used to improve the taste, and therefore suggest that the taste of pork hide is indeed of a poor quality. The problem with palatability was recognized in the prior art, and people have tried to overcome it, but in different ways. The Anderson reference suggests to use large amounts of a meaty filler in order to overcome the palatability problem of raw hide. And again, Anderson discusses raw hide as well as Sherrill. Both references are limited to raw hide, and both explain what they mean by that. In Sherrill, it's cow and buffalo, and in Anderson, it is cow, buffalo, and beef. Neither reference mentions pork skin or pork hide anywhere. Both say that raw hide has a problem with palatability. They try to overcome it by using either a large amount of a meaty filler in Anderson or in Sherrill by using a jerky and positioning the jerky close to the outside of the cheek so that the pet can smell and taste the jerky at all times. So this problem, people attempted to overcome, but none of the references recognized what is taught in the Brown Patent, and that a particularly efficient method to overcome it is simply not to use raw hide at all. By going to a different shoe medium, by using pork skin or pork hide, the Brown Patent for the first time allowed people to design pet shoe toys that overcome the problems of raw hide simply by not using raw hide, and by having a product that realizes product advantages that people have been wanting to develop for a long time. But what kinds in the prior R&R still have this problem with distinguishing? Well, the claimed shoe toys have a particular structure. They use multiple layers of pork skin as an outer shell and an inner encapsulated meat product in that. And there is no shoe toy described anywhere in the prior R&R that combines pork skin with a meat product. Not a single reference discusses such a shoe toy. But there are references that describe pork skin and there are references that describe meat fillers. The question is, would it be obvious to combine the two? Well, there are two references that use raw hide and a meat product. Those two references are Sherrill and Anderson. Both of those talk about the problems with the hide because of the poor palatability. So, I think under KSR versus Telflex, the question that we have to ask... How did those references overcome the poor palatability? I'm sorry? How did the references overcome the poor palatability? Yeah. And they weren't designing something which would be unpalatable to dogs, right? Exactly. I mean, both of them... What they did was, in Sherrill, it used a jerky. So, the jerky is a meaty, smelly, tasty substance. And Sherrill said that it is important to position the jerky close to the outside. So, they wrap it into the outer layer and let it extend from the outer layer. That way, the pet can smell and taste the jerky from the beginning. Now, the claimed chew toys have an outer shell of multiple layers. So, the meat product is inside and not as readily available. The pet first has to chew through the shell, the outer shell of pork skin. The advantage of this construction is that it forces the pet to chew through the outer shell to reach the meat product on the inside. That is an advantage that is discussed in the Brown patent. And, in fact, I believe Weinberg acknowledged the accuracy of this superior construction in patent applications that Mr. Weinberg filed years after the Brown patent in the patent office where he also discusses the Sherrill patent that makes exactly the same distinction and raises the same concerns over Sherrill. So, the Brown patent in comparison to Sherrill has a superior product because by positioning the meat product deep in the inside, it forces the pet to chew longer. Now, Sherrill could not be changed in its structure because the Sherrill references explicitly said that the pet is attracted by the taste and smell of the jerky. So, it is important in Sherrill to have the jerky on the outside, to have it available to the pet from the beginning. So, that is a distinction that allows us to differentiate our invention from the Sherrill reference. And, again, Sherrill states explicitly why it does that and why it is important to maintain that structure. In Anderson, Anderson discusses Sherrill. Anderson came out after Sherrill. And, Anderson says, well, Sherrill tried to overcome the palatability problem of rawhide by placing the jerky to the outside. But, the problem is Sherrill just uses too much rawhide and it makes the palatability problem even worse. So, we are trying to overcome that by using very large amounts of meaty filler. Now, Anderson places the meaty filler in the inside. But, Anderson is constricted by and handicapped by its choice of rawhide. Anderson nowhere suggests or mentions pork skin. For the meaty filler part in Anderson, it does mention pork. So, it is not an oversight. It mentioned pork where it meant to include it, but it did not include it. And, it apparently didn't consider it for the hide fraction. So, because Anderson made that choice by working with rawhide, Anderson had to, just like Sherrill, attempt to overcome the problem with the poor palatability. And, it chose to do that by having a large amount of filler. And, Anderson recognized the problem with that is that it cuts down on the chew life. And, chew life and palatability are the key issues in product development. Now, those problems, the problems from Sherrill and the problems from Anderson, are overcome in the claimed chew toys by using pork skin. And, that was an unpredictable, unpredicted result, which is recognized even by AVI and Weinberg. So, I see I'm out of time. Yes, we'll save the rest of your time. Thank you, Your Honor. Thank you, Your Honor. May it please the court, on the issue of claimed construction, the only thing I will say about that is that the court is right that- Let's think about this. Well, in terms of the superior palatability of pork skin, the recent Supreme Court opinion in the KSR case makes mention of the fact that it's not necessary to look at the exact problem that the inventor was trying to solve to find some rational reason to combine references. Well, it depends on the invention. Let's stick with this one. Okay, exactly. But, the point in Lynch that was made at, it's in the appendix, page 1875, column 3, lines 16 through 25, is that pork skin is more digestible than rawhide. And, that could provide another reason for someone in the art to try pork skin or to use pork skin as opposed to rawhide. Just another reason why that combination of using pork skin instead of rawhide with a meat filler would have been obvious to a person of ordinary skill in the arts. Mr. Moses, I understand at KSR that combining references is still an important consideration. I didn't see here much, and correct me if I'm wrong, much of the discussion on the part of the district court about combining these various references. You've got Fisher I, Fisher II, Sherrill, Anderson, Chom, and Dingo Porky, all of these various references. What can you tell us about motivation to combine? Well, the district court noted... In light of, particularly in light of KSR. Right. Well, there's several questions there. In light of KSR, I believe what KSR is saying is that there still has to be some reason to combine references. You can't just take bits and pieces of the prior art, various references, lump them together and say, okay, we have all the elements of the challenged claim here, so it's obvious. That's not the test. And, the Supreme Court made that clear. The Supreme Court, and I think it's cited to this court's opinion in Ray Kahn, said there has to be some type of rational reason with evidentiary support to demonstrate a reason to combine, but it didn't use the words motivation, teaching, suggestion. I think, and this court's recognized in more recent cases such as DISTAR, that that basis for combining references is broader than an explicit statement in the prior art. It can be from common sense, from common knowledge, and KSR recognized it could be from... Where do you see in this case the source of the motivation to combine these number of preferences? Okay. In the Anderson patent, and that's, I think the first page in the appendix is 1843, the Anderson patent mentions this general challenge, this general tradeoff, that faces persons who are designing pet chew toys. And that tradeoff is, if you increase the amount of animal skin wrapped around the product, the product will have a longer chew life, which is one of the goals. These products are designed to clean pets' teeth and exercise their jaws and whatnot. And the tradeoff is that when you have too much skin, the palatability goes down. And that, in a sense, Anderson almost explained what the problem is in the art and how to go about fixing it. If you want more flavor, you can increase the amount of filler. If you want more chew life, you increase the amount of skin. And we can see in the art there are various attempts to do this. The Sheryl patent is a really high ratio of skin to meat, and it has a very firm chew. And it uses a jerky, which is attractive to dogs, to bring the pet to the chew to engage it for a long period of time. Anderson chose to go with a higher meat filler. But the reason to combine, it's almost here, KSR in a sense is not even, if we want to characterize KSR as possibly affirming a broader analysis for a reason to combine, KSR in a sense is almost not even necessary to the whole thing because Anderson itself explains the problem in the art, the challenge, how to go about addressing it. And one point that, you mentioned multiple references, Your Honor, the Degas Quirky, the Fisher patents, and so on. My colleague has mentioned, my opponent, my colleague has mentioned that none of the prior art references taught pork skin. And I would disagree with that simply because the Fisher patent, it's at page 1519 of the appendix, defines rawhide, just the term rawhide, as basically any animal skin. And that reference was from over 40 years ago. So that reference is important to show that any animal skin can be encompassed within what's called rawhide. Anderson itself not only mentioned, I believe it was cowhide, water buffalo hide, it said any similar starting material. Basically these products are a piece of animal skin wrapped around some type of filler. And to say that using pork skin is some novel, unthought of, not previously appreciated attribute or not previously appreciated innovation is, to me, it's crazy because the art talks about, just has a general description for these products. It defines terms such as rawhide to include any animal skin. Anderson says cowhide, water buffalo hide, any similar starting material. So these references are not limited to pure, what my opponent called rawhide, which has a broader definition than just hide from a cow. Would it be obvious to have the outside of pork skin with a cheese filling? Well, I believe in the art there have been, and this maybe characterizes some of the patterns, I don't recall offhand, but there have been uses of cheese as a means for attracting a dog. What's the purpose of the word in prior art references that make reference to cheese? I mean, people love dogs like cheese. People who make chew toys put rawhide on the outside. Why do you need any prior art reference that refers to cheese? Your point is well taken, and I believe, consistent with this court's precedent, that common knowledge and common sense may form a basis for combining references. And people know dogs like cheese, people know dogs like meat, people know dogs have a great sense of smell, so if they put something aromatic in the middle that a dog may decide to consume, that to me would be obvious. I don't think there's a lot of innovation left in this industry because there's simply a piece of rawhide wrapped around meat, and that's out there, it's been out there. And one reference that my opponent did not really dive into was the Dingo Porky product. And this is a product that was in the market prior to the patentee's conception, or alleged conception, of the invention in this case. And the Dingo Porky, we have a series of corporate minutes in the record, starting at appendix page 1272, that describe the process of how this product was launched to market. It was before the patentee filed his patent, and it's actually before the date of invention. And this is confirmed in a declaration by Mr. Wheeler, page 1742 of the appendix. And that product, the Dingo Porky, is rolled pork pie with chicken skeletal muscle filler in the middle. And that's in the Wheeler declaration as well. And interestingly, the patentee, Mr. Brown, had a letter sent to the company that produces the Dingo Porky contending that that product was within the scope of claim one of the patent in suit here. So we would argue that what is possibly infringing later in time would be anticipated if earlier in time, as the Dingo Porky is. And the Dingo Porky would also serve to render the additional claim for obvious, which specifically recites a limitation as to a lowered fat content of the pork skin, because everybody in the industry defats pork skin. You have to. It's a greasy, stinky mess if you don't do that. And so it's common knowledge in the industry that pork skin must be defatted. And that's confirmed at a declaration, Christopher Weinberg, page 1814 in the record. My opponent, one last point on that, the use of pork skin. In KSR, the Supreme Court mentions that it's obvious to try standard. And that if there's a limited number of variables available to persons in the industry for a particular component of a product, in this case, let's say, the outer casing of the product. There's skin, there's a variety of animals, but not every animal is available. So it's kind of a limited universe. In KSR, also mentioned and stressed what enabled brain factors, the so-called objective secondary considerations like commercial success. And I gather that that is a factor in this case. Your Honor, the patentee did not provide any evidence of any commercial success in this case, despite being asked for it in discovery. There's not one piece of paper in the record that's an invoice for a sale that his company made. On behalf of the patentee, but I gather that the accused products are experiencing commercial success. Some success, that's true. There is some success of the commercial products. The secondary considerations, as far as the long-felt need, I don't know. Let's talk about commercial success. Commercial success. The accused infringer has experienced some success with this product. It's a relatively low-cost, low-profit margin product. And he sold a fair amount of these. And these other prior patents, I have no way to speak to the success of those products. But I know that with respect to these Dato brand products, they're available in the marketplace. So there is a market there, for sure. And if the argument is jerky, is that right? In the DATO report? Yeah, it's a jerky or chicken meat. I believe it's chicken jerky. I think it's page 1898 to 1903, and the appendix has some pictures of the packaging. I don't remember if it mentions chicken meat or chicken jerky, but it's chicken skeletal muscle, which would be a component of jerky. So that product with pork skin wrapped around a jerky filler was successful, and it predates the patentee's invention. So to say that his innovation... I'm saying that the accused product predates the patentee's invention. The accused product... The accused product is not... I was talking about the Dingo Porky. I'm sorry if I was confusing there. The Dingo Porky product, which actually is one of the products that exists under the Sherrill patent in the record, which is in 1852, that product predates the applicant's, the patentee's, conception of his invention. And you're saying that the prior... you were just... you were talking about prior art products. That's right. Necessarily, they predated the prior art. Right, but I'm saying there was success in the market with this configuration of products before the patentee allegedly conceived his. And I say allegedly because that's another issue that's still languishing. The issue here is anticipation. The issue is obviousness. Isn't that right? We raised anticipation in the district court, and the district court didn't rule on it. I mentioned it in the brief. The district court didn't rule on it, though, so it's not technically before this court. So the point I'm trying to make is that the commercial success of these products existed prior to the applicant's invention. So what he claims to have invented... I'm sorry when you say commercial success of these products, but let's maintain the distinction between the accused products, which are not prior art, to this patentee. Fair enough. And those which are. The product, such as the Dingo Porky product, which is prior art, was a successful product to the best of my knowledge. They're still in the market today, so they must have made some impact. That's prior art. That was distinguished before the patent office. Well, the Dingo Porky was not before the patent office, which is interesting in and of itself, because the applicant, the patentee, and the accused infringer traveled to China just before the patentee claims to have conceived this invention and went to the factory where these products, these Dingo Porky products, were made or a showroom where they were shown and saw these products, but it was never disclosed to the patent office. So the Dingo Porky... Was it made prior to their origin? No. Yes, absolutely. I referenced the Wheeler Declaration and the Portworth Minutes that I believe they started at 1272 or the Portworth Minutes and the Wheeler Declaration, 1742, in the appendix to show that the Dingo Porky product is, in fact, prior art. So I see my time has run out over there. Any further questions the court would like me to address? Are there any further questions? Thank you. Thank you, Mr. Nielsen. Mr. Stahl? Thank you very much. Just very quickly, I mean, Mr. Nielsen mentioned the tradeoff. The Anderson reference, for example, talks about, well, either I use a lot of meat and I have good palatability or I use a lot of hide and then I have a long chew life. That is the tradeoff that Anderson had to struggle with, but it is a tradeoff that the Brown patent allows the designer to largely avoid by using a better shell of substance, the pork skin. The taste will not suffer by using less meat product compared to Anderson. So the tradeoff that was the problem in the prior art has been largely overcome. It's hard to find that distinction in the claims. Well, the distinction of the claims is the pork skin and that's broadly the prior art. The prior art does not teach or suggest a chew toy with the structure described in the claims. Well, then it would be anticipation if it did. If it did, yes, it would be. So if we get the prior art, it's supposed to be the pork skin and it's supposed to be the fillet that are combined? Right. But we need to know what would motivate the skilled artisan to make it. Not after KSR, do we? I'm sorry? Not after KSR, do we? Well, I think in KSR, the KSR court still emphasized that one needs to ask the question whether when we combine known elements, whether the result was predictable. The court emphasized that several times. So if we ask the question here, was it predictable based on the record, there's absolutely nothing, no evidence, no declaration, no prior art, nothing to suggest that pork skin had superior palatability. The only evidence is the brown patent. There is nothing else. So if we can make a combination without anything of record, without any prior art, any declaration, nothing, then I think we can simply combine old elements without any guidance and simply use them. Well, even that has to be explained because here what the district court did is to say that it did not believe the teaching of the brown patent. It did not rely on common sense. It did not rely on any of these things. Also, Sheryl and Anderson are two examples of prior art designers who tried to make a tuto using a hide and a meat product and make it as good as they could. Neither one used pork skin. If common sense was the guide that led to success, one would imagine that either Anderson or Sheryl would have recognized that line. I mean, there are all sorts of combinations that may be useful. The fact that this particular combination wasn't included in the prior patent doesn't suggest that it's not a good combination. It doesn't suggest that it is not good, but I think in all the case files from this court, there has to be something identified in the knowledge or the art somewhere that would guide the person to that particular choice. Not anymore. That's the point of KSR. You don't have to find the suggestion in the prior art. No, I'm not saying it has to be found in the prior art, but in all cases that this court has decided and that came out recently, the court has always identified a motivation or something. For instance, in Apotex, there was a list from the FDA identifying 53 pharmaceutically acceptable anions. So the invention was simply working with a list of anions from the FDA, and there was guidance. In my one, there was— But studying us, our cases, in a post-K or KSR environment doesn't help with that. Well, but KSR still emphasized that if the combination yields an unpredictable result, as, for instance, it did in atoms, it is patentable. KSR has confirmed that when a patent combines old elements, it is not rendered obvious by simply pointing out that the elements were known independently. There has to be something that would have made it predictable. Now, whether it is the principle of gravity relied on in Sequeira or something else, but there has to be something. What Mr. Nielsen pointed out is that, in early reference, he used rawhide to suggest it means an animal, any animal. But then we end up again with the multiple choices of different animal species from which one can pick, except nobody knows which one would work best. And out of this large group of different materials, there is nothing that would have pointed to pork skin as having superior palatability. And the district court has recognized that, and in fact tried to overcome that by simply suggesting that the teaching of superior palatability in the Brown patent was inaccurate, but there is no evidence on the record to suggest that it is inaccurate. Adrian Weinberg also recognized that there is no teaching of that superior palatability of pork skin anywhere in the prior art. Now, they could have supplied a declaration of somebody saying, yeah, I would have thought of it or something that we could have addressed, but there is absolutely nothing. We're looking at an empty record, and I think if we simply use the word common sense to say, well, sounds good enough. I mean, people have known these elements, and therefore we're just going to combine them. I think that would be a tool that, for purposes of a patentee, to address that and respond to that without any evidence to specifically address it. It would be, if I may allow to use the term, a bit of a wild card, because as a patentee, we would like to have an opportunity to respond if somebody says, well, you just follow this instinct or that principle or that. But here, a choice was made based on something for which there is absolutely no guidance anywhere in the record, anywhere in the prior art, or anywhere else. Thank you very much.